IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID PAYO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 20-1176 |
| | ) |
| DR. D.W. STECHSCHULTE, JR., et al., | ) Magistrate Judge Dodge |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Plaintiff David Payo, a prisoner currently incarcerated at the Federal Correctional Institution at Hazelton in West Virginia, brings this civil rights action under 42 U.S.C. § 1983. He raises claims under the Eighth and Fourteenth Amendments to the United States Constitution and Article I, § 13 of the Pennsylvania Constitution that purport to arise out of medical treatment that he received when he was incarcerated at the State Correctional Institution at Laurel Highlands, Pennsylvania ("SCI Laurel Highlands"). The remaining defendants are Wellpath, LLC (the medical provider), Dr. Andrew J. Dancha and Practicing Nurse Ryan Matthews (together, the "Medical Defendants").

Pending before the Court is the motion for summary judgment of the Medical Defendants. For the reasons that follow, their motion will be granted.[1]

### I.   Procedural History

Plaintiff filed this action on September 1, 2017 in the Court of Common Pleas of Allegheny County, naming only Warden Orland Harper and Dr. D.W. Stechschulte, Jr. and raising claims regarding his care while he was at the Allegheny County Jail ("ACJ"). In June

---

[1] The parties have consented to full jurisdiction by a magistrate judge.

2020, he filed an Amended Complaint in which he added the Medical Defendants and claims relating to his care while incarcerated at SCI Laurel Highlands. The Amended Complaint alleged that Defendants were deliberately indifferent to his serious medical needs both at the ACJ and at SCI Laurel Highlands.

The Medical Defendants removed this action to this Court based on federal question jurisdiction over the civil rights claims and filed an Answer to the Amended Complaint. Warden Harper and Dr. Stechschulte filed a motion to dismiss that was granted and they were dismissed from this action with prejudice. Following a period of discovery, the Medical Defendants filed the pending motion for summary judgment (ECF No. 25), accompanied by a brief in support (ECF No. 26), a Concise Statement of Material Facts and an appendix (ECF No. 27). Although Plaintiff was given several extensions of time (ECF Nos. 29, 30), he has not submitted a response to the motion or sought a further extension.

## II. Facts

Plaintiff was incarcerated at the ACJ from June 9, 2017 to March 19, 2019. On March 18, 2019, a Release Summary Form from the ACJ was completed in advance of his transfer to SCI Greene. The form listed his active problems as chronic pain, lower bunk/tier status, and his active medications, which included Ibuprofen, Baclofen and Lisinopril. (Defendants' Statement of Facts ("DSF") ¶¶ 14, 24.)[2]

On August 27, 2019, he was transferred from SCI Greene to SCI Laurel Highlands. In advance of the transfer, Intra-System Nursing Transfer Checklist and Intra-System Reception

---

[2] ECF No. 27. The Court has confirmed that the facts are supported by the medical records Defendants have supplied. In addition, because Plaintiff has not responded to Defendants' statement of facts, they are undisputed and deemed admitted. See Fed. R. Civ. P. 56(e)(2); LCvR 56(E).

Screening were completed. The checklist provided that Plaintiff's chronic medical problems included low back pain. The screening listed his then-current medications as follows: acetaminophen 325MG; Duloxetine 60MG; Ibuprofen 600MG; Lamotrigine 100MG; Levothyroxine 175MG; Lisinopril-Hydrochlorothiazide 20-25MG; metoprolol 25MG; and Nortriptyline 50MG. (*Id.* ¶ 48.)[3]

Two days after his transfer, Plaintiff was given a number of exams as part of his initial intake. Following this, he was seen by CRNP Erin Clark. She noted he was a new intake with a history of hypertension, Hepatitis C, possibly Hepatitis B Virus ("HBV"), and hypothyroidism. In addition, it was noted that he had chronic back pain where his L4-5 disc was removed and worsening radicular pain that radiated down his right leg. It was also noted that he performed physical therapy exercises every day for the past three years. Per the plan, he was to have his HBV viral load checked, his Pamelor prescription was to be replaced with two daily doses of Tegretol 100MG, and his daily double doses of Lopressor was changed to 25MG in an effort to fix the incorrect dosing. He was also restricted from lifting more than thirty pounds. (*Id.* ¶¶ 49-50.)[4]

On September 4, 2019, Plaintiff refused to take his morning dose of Tegretol 100MG, which was prescribed as treatment for chronic pain, because it "[made him] dizzy." Thereafter, he executed a "Release from Responsibility for Medical Treatment." (*Id.* ¶ 53.)

---

[3] The Medical Defendants have also included information about Plaintiff's treatment at the ACJ and SCI Greene. (DSF ¶¶ 9-23, 25-47.) Because this case is limited to the care he received at SCI Laurel Highlands, these records need not be cited here.

[4] Defendants have summarized all of Plaintiff's medical records at SCI Laurel Highlands, which include his treatment for Hepatitis C, hypothyroidism, a peptic ulcer, a brain cyst, kidney cysts, cracked skin, allergies, hyperlipidemia and an instance in which he was hearing voices. He also had an eye exam and dental work. Because these records are not relevant to the claims that Plaintiff has asserted in this case, they will not be discussed in any detail.

CRNP Clark treated Plaintiff on September 9, 2019, for complaints of chronic back pain. During the visit, he reported that his Tegretol medication made him dizzy and did not help with his pain. However, upon examination, he was observed ambulating without issue. As such, CRNP Clark prescribed two daily doses of Keppra 500MG and instructed him to follow-up with care if his symptoms did not improve. He was seen on September 9, 2019, for complaints of itching and a rash that developed on his torso and arms. It was noted that he started Keppra several days prior. Thereafter, CRNP Clark assessed Plaintiff for an allergic reaction, and then prescribed him three daily doses of Diphenhydramine 50MG. She then instructed him to follow up on an as-needed basis. (*Id.* ¶¶ 55, 57.)

Dr. Dancha saw Plaintiff for his complaints of ongoing low back pain with radiation to his right lower extremity on September 18, 2019. He noted that Plaintiff previously had lumbar spine surgery, an X-ray revealed the presence of hardware, and he was actively participating in physical therapy from which he had modest relief. Upon examination, it was determined that he had spasms/stiffness in his low back region. Dr. Dancha subsequently assessed him for spinal stenosis, including post-status fixation rod and pedicle screws in his lumbar spine with an L4-5 spacer causing chronic pain, and radiculopathy. Dr. Dancha prescribed an increasing dose of Gabapentin, i.e., such that it could go up to 600MG over the next two weeks. However, he noted that the prescription was not to be titrated to the maximum dose. Plaintiff could continue to take Ibuprofen. (*Id.* ¶ 59.)

On September 26, 2019, Plaintiff was seen by Marie Dilascio, CRNP, who noted that he wanted to discuss the medication for his back condition. At that time, he reported that he was recently started on Gabapentin and his pain was more under control but he still used Motrin on an as-needed basis. CRNP Dilascio renewed his Ibuprofen prescription and directed him for

follow-up care on an as-needed basis. (*Id.* ¶ 60.)

Plaintiff was then seen by physical therapist Roger Mason on October 2, 2019, for complaints of constant low back pain on his right side. At that time, he rated his pain as a six out of ten and reported that he stretched to help reduce the pain. Thereafter, he was assessed for his low back pain. It was ultimately determined that he should continue his then-current treatment for one more month. On October 7, 2019, he was seen by Jill Brant, CRNP, in response to his request to increase in his daily Gabapentin (Neurontin) dose. She noted that he wanted to increase his Neurontin to three times per day, but Dr. Dancha did not feel that an increase was warranted and indicted that he could take Tylenol or Motrin. (*Id.* ¶¶ 62-63.)

Plaintiff requested a midday dose of Gabapentin in addition to the two daily doses he had already been receiving on October 21, 2019. At that time, Ms. Beck assessed him for chronic back pain, and then instructed to use Tylenol and Motrin throughout the day on an as- needed basis. She noted that Plaintiff was not happy with the plan of care and asked to see Dr. Dancha. On October 24, 2019, Plaintiff asked Dr. Dancha for an increase in Gabapentin because his current dose wore off mid-afternoon. Plaintiff reported that he was placed on kitchen duty and stood for eight hours per day but could not complete the work because of the pain. Dr. Dancha subsequently assessed Plaintiff for chronic back pain with radiologic evidence of fixation rods, screws, and vertebral spacer in the lumbar region and increased the Gabapentin prescription to 600MG and to be taken three times daily, but it was not to be titrated any higher. He noted that Plaintiff was scheduled to transfer to a federal prison in six months. Dr. Dancha also directed him to only do sedentary work, engage in passive sports, and prohibited him from lifting. (*Id.* ¶¶ 67-69.)

On November 1, 2019, Plaintiff was seen by PT Roger Mason and reported "little change in [his] back pain." Upon examination, he rated his pain as a 7 out of 10 but was still able to ambulate with little difficulty. He reported that he experienced difficulty with lifting type activities. Further physical therapy treatment was discontinued due to a lack of improvement with treatments. (*Id.* ¶ 70.)

Plaintiff was next seen by CRNP Clark on December 9, 2019, in response to his request to see Dr. Dancha for an increase of his Gabapentin and for complaints of worse pain in his back during the Winter. She observed that he was walking around without limp or issue. It was also noted that he had a history of a spinal stenosis s/p fixation. She subsequently assessed Plaintiff for back pain, and then discussed Plaintiff's full functionality and lack of a medical reason to increase Gabapentin with Dr. Dancha. (*Id.* ¶ 75.)

As noted in a December 29, 2019, Medical Incident/Injury Report, Plaintiff reported to nursing complaining of his chronic low back pain. There was no new injury. He reported he did not feel anything because he "drank enough alcohol," which could be smelled on his breath. He was admitted to the Infirmary for medical observation. Nurse McKenzie Yuko saw in the Infirmary, noting he was housed there after making and drinking alcohol, and she quoted him as saying, "I'm the brew master." He was to be monitored.

During first shift on December 30, 2019, Plaintiff was seen by Amy Clark, R.N. Upon examination, he was observed walking without issue and otherwise found to have clear speech, able to make his needs known, follow commands and answer questions appropriately, and eat and drink without issue. A subsequent assessment revealed that he was medically stable. The plan was to continue his care. Later that day, he was seen by Amber Dupont, RN. Upon examination, he was observed independently ambulating, having no complaints of dizziness,

headaches, nor nausea, and was subsequently cleared to return to his block. That evening, he was caught making and drinking "hooch." At that time, he reported that he was "fine" and "I do this all the time, I know what I'm doing." Upon assessment, he was determined to be medically stable. Csaba Mihaly, M.D. subsequently educated and counseled him as to why he should not drink fermented "hooch," in addition to further instructing him to drink plenty of fluids and stay hydrated. (*Id.* ¶¶ 78-82.)

On January 8, 2020, CRNP Clark reviewed Plaintiff's labs, and then assessed him for acute kidney injury. She discontinued the Motrin prescription, replaced his Prinzide prescription with Lisinopril 20MG, prescribed him Baclofen to be taken three times per day for two weeks to assist him with walking, and ordered him a renal ultrasound and CMP recheck in two weeks. (*Id.* ¶ 85.)

Plaintiff was seen by Nurse Matthews on January 20, 2020, regarding his requests for Motrin. Mr. Matthews informed him that his Ibuprofen was decreasing his kidney function and that discontinuation of the Ibuprofen would help. Mr. Matthews further explained that Plaintiff had polycystic kidney disease and that he would monitor his kidney function. Plaintiff acknowledged this, but then requested an increase of his Gabapentin. Thereafter, Mr. Matthews assessed him for low back pain and polycystic kidney disease, and then discontinued his Ibuprofen and noted that he planned to speak with Dr. Dancha about Gabapentin. He then instructed Plaintiff to return to care on an as-needed basis and scheduled him for a basic metabolic panel to be taken in one month. (*Id.* ¶ 88.)

On January 29, 2020, Plaintiff was seen by Nurse Matthews for requests for an Ibuprofen prescription as treatment for his back pain. He said he had been taking Ibuprofen on his own because the pain was excruciating. However, Mr. Matthews noted that he was ambulatory

without any limp and that he had no wincing when he sat in a chair. Mr. Matthews explained that he could purchase Ibuprofen from the commissary if he wanted to continue that therapy, but that the medical department would not prescribe it. (*Id.* ¶¶ 88-89.)

Plaintiff was seen by Csaba Mihaly, M.D. on January 29, 2020 for his request of Ibuprofen or Mobic for his back pain and complaints of a cough. Upon examination, he was found to ambulate and function well and have a tender low back, intact Achilles' tendon function and hip elevation, and equal muscle strength. He was subsequently assessed for chronic low back pain without functional deficit and mild bronchitis. Per the plan, he was to continue his prescribed medications, as no changes were made to his prescriptions. It was also noted that NSAIDs, SSIs and cough syrup were not indicated due to his kidney functions and dexamethasone and Lodine cross-reactions. On February 14, 2020, he refused to be seen for a sick call visit that was scheduled in response to his request for Motrin on February 12th. It was noted that he was "loud, argumentative, and disruptive to [the] department." (*Id.* ¶¶ 90-91.)

On February 19, 2020, Plaintiff was seen by Dr. Dancha on sick call in the RHU for complaints of back pain and request for lotion for his dry, cracked feet. With respect to his back pain, he requested Ibuprofen, instead of Tylenol, as treatment for his back pain. Dr. Dancha subsequently assessed him for chronic lumbago, and then discontinued his Tylenol prescription and prescribed Ibuprofen 400MG to be taken three times per day on an as-needed basis. (*Id.* ¶ 93.)

Plaintiff was then seen by Nurse Matthews on March 10, 2020, for complaints of "bad" pain in his back for which he requested an increase of his Ibuprofen. Mr. Matthews observed him lying in bed, turning without issue, and having no decrease in ROM. He then assessed Plaintiff for chronic low back pain. Following this, he increased the Ibuprofen dose to 600MG,

as requested, until he was released from the RHU, at which time he was to purchase the medication from the commissary. He also instructed Plaintiff to follow up with him on an as-needed basis. Plaintiff was released from the RHU to general population on March 12, 2020. (*Id.* ¶¶ 96-97.)

On March 19, 2020, Plaintiff was seen by Dr. Dancha on the MD line after he was found with two uncrushed Gabapentin 600MG tablets in his pocket. As a result, he placed back in the RHU. The plan was to wean him off of Gabapentin, and then prescribe him Celebrex 200MG for his back pain.

Plaintiff was permanently transferred from SCI Laurel Highlands to SCI Pine Grove on March 20, 2020. Prior to his transfer, his vital signs were checked and determined to be normal, with the exception of his pulse which was recorded as 129. His chronic conditions/problems were noted as "back pain." Plaintiff was to be housed in the RHU as he was not cleared to be housed in general population. The plan was for him to be weaned off of Gabapentin, as instructed by the medical director on March 19, 2020, because of the pills that had been found in his pocket. (*Id.* ¶¶ 104-05.)[5]

## III.  **Standard of Review**

The Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof

---

[5] Defendants have also cited to medical records from Plaintiff's incarceration at SCI Pine Grove. (*Id.* ¶¶ 105-47.) However, they did not treat Plaintiff while he was at this institution (ECF No. 26 at 21).

at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the lack of a genuine issue of material fact.

Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *Nat'l State Bank v. Federal Rsrv. Bank,* 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler County Fam. YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001). However, pursuant to the Federal Rules of Civil Procedure:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials-- including the facts considered undisputed--show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e). As the Advisory Committee Notes to the 2010 Amendment indicate,

"summary judgment cannot be granted by default even if there is a complete failure to respond to the motion." *See also Anchorage Assoc. v. Virgin Islands Board of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990) (a moving party is not "automatically entitled to summary judgment if the opposing party does not respond.").

Therefore, despite Plaintiff's failure to respond or counter the facts and legal arguments of the Medical Defendants, the Court will evaluate their motion on the merits to determine if they are entitled to summary judgment in their favor.

**IV.   Analysis**

Plaintiff's claims are asserted under 42 U.S.C. § 1983, which provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). *See also Baker*, 443 U.S. at 140; *Graham v. Connor*, 490 U.S. 386, 394 (1989).

The Amended Complaint alleges violations of the Eighth Amendment,[6] which prohibits

---

[6] The Medical Defendants refer to the claims asserted against them as Counts 5, 6 and 7 of the Amended Complaint. However, the Amended Complaint does not include Counts 1-4. Rather, Plaintiff alleges the basis for jurisdiction under Roman numeral "I," names the parties in "II," alleges facts in part "III" and states his claim for deliberate indifference against the ACJ Defendants in "IV." Under part "V," he alleges claims of deliberate indifference against Wellpath and Dr. Dancha and in "VI," a claim of deliberate indifference against Matthews.

11

the imposition of "cruel and unusual punishment." The Amended Complaint also mentions the Fourteenth Amendment, which prohibits a state (or state actor) from depriving "any person of life, liberty, or property, without due process of law" or from denying "any person within its jurisdiction the equal protection of the laws." As the Supreme Court has held, however, the Eighth Amendment is made applicable to the states through the Fourteenth Amendment. *See Robinson v. California*, 370 U.S. 660 (1962). Thus, it appears that Plaintiff may have referenced the Fourteenth Amendment solely for that purpose since the Amended Complaint contains no specific reference to the protections of the Fourteenth Amendment.[7]

Plaintiff's claims in this case concern the conditions of his confinement at a state correctional institution after he was convicted and sentenced. Therefore, the Eighth Amendment applies to the claims that have been asserted by Plaintiff.[8]  *Hubbard v. Taylor*, 399 F.3d 150, 164 (3d Cir. 2005) (footnote omitted) (quoting *Graham*, 490 U.S. at 392 n.6). *See also Murray v. Keen*, 763 F. App'x 253, 255 (3d Cir. 2019) ("sentenced prisoners are protected only from punishment that is 'cruel and unusual' while pretrial detainees are protected from any punishment") (citing *Hubbard,* 399 F.3d at 166-67)).

   A.  Eighth Amendment Claim

The Eighth Amendment prevents prison officials from acting with deliberate indifference

---

Finally, under "VII," he sets forth a conspiracy claim under the heading "cruel and unusual punishment."

[7] The Medical Defendants argue that Plaintiff "also appears to allege that [they] violated his right to equal protection." (ECF No. 26 at 32.) However, the Amended Complaint makes no reference to or comparison between Plaintiff's treatment and the treatment of anyone else.

[8] Pennsylvania courts have held that: "Because the guarantee against cruel and unusual punishment in Article I, Section 13 of the Pennsylvania Constitution provides no greater protection than that afforded by the United States Constitution, our analysis of Petitioners' Eighth Amendment claim will determine the sufficiency of their claim under the Pennsylvania Constitution as well." *Tindell v. Department of Corr.*, 87 A.3d 1029, 1036 (Pa. Commw. 2014).

to prisoners' serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "In order to establish a violation of [a prisoner's] constitutional right to adequate medical care, evidence must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden County Correctional Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (citing *Estelle*, 429 U.S. at 103-04 (other citation omitted). Moreover:

> the concept of a serious medical need, as developed in *Estelle*, has two components, one relating to the consequences of a failure to treat and one relating to the obviousness of those consequences. The [prisoner's] condition must be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death. Moreover, the condition must be "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."

*Colburn v. Upper Darby Township*, 946 F.2d 1017, 1023 (3d Cir. 1991) (quoting *Monmouth County Correctional Inst. Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir. 1987) ("*MCCII*")).

A prison official acts with deliberate indifference to a prisoner's medical needs only if he or she "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). As the Court of Appeals has held:

> the *Estelle* "deliberate indifference to serious medical needs" standard is clearly met when a doctor is "intentionally inflicting pain on [a] prisoner[ ]." In *MCCII*, we identified several other scenarios that satisfy *Estelle*. Most relevant to this case are (1) "[w]here prison authorities deny reasonable requests for medical treatment ... and such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury,' " *MCCII*, 834 F.2d at 346 (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)), and (2) "where 'knowledge of the need for medical care [is accompanied by the] ... intentional refusal to provide that care,' " *id.* (quoting *Ancata v. Prison Health Servs.*, 769 F.2d 700, 704 (11th Cir. 1985)) (alterations in original).

*Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (quoting *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990)). "Mere disagreements as to the proper medical treatment [do not] support a claim of an Eight Amendment violation." *MCCII*, 834 F.2d at 346. Nor do allegations of malpractice. *Spruill*, 372 F.3d at 235.

The Medical Defendants do not dispute that Plaintiff's back condition presented a serious medical need and the Court agrees that based upon the undisputed facts, it does represent a serious medical need. At the same time, the Medical Defendants contend that there is no evidence that they were deliberately indifferent to Plaintiff's needs.

As the Medical Defendants have thoroughly documented, Plaintiff was seen and treated frequently for his back pain. During the nearly seven months that he was incarcerated at SCI Laurel Highlands, he saw Dr. Dancha, Nurse Matthews or other medical providers seventeen times for treatment regarding his back pain (in addition to other visits concerning other medical conditions). Plaintiff was seen, evaluated and treated on a regular basis and was prescribed medication as medically needed, which was increased or altered when he reported more severe symptoms or side effects.

In the Amended Complaint, Plaintiff complains that some of his requests for increased Gabapentin were denied, but it is undisputed that he was given other medication for his pain. He was also allowed to supplement his prescription pain medicine with Ibuprofen until it was determined that it would negatively affect his kidney function. Plaintiff alleges that he continued taking Ibuprofen anyway with no ill effects. As the Medical Defendants note, however, the records unequivocally establish that he had cysts on his kidneys and Nurse Matthews exercised his professional judgment to determine that it was best to discontinue the Ibuprofen because of its effects on Plaintiff' kidney function. Moreover, Nurse Matthews told Plaintiff that he could purchase Ibuprofen from the commissary if he wished to do so.

Even after Plaintiff's prescription for Gabapentin was discontinued because he was found to possess unauthorized pills during a search, the medical plan was to replace it with Celebrex

in order to continue to treat his back pain. Thus, his complaint that Nurse Matthews merely took his co-pays but did not provide any medical care is contradicted by the undisputed record.

With respect to Dr. Dancha, the record establishes that he saw Plaintiff as needed, provided the dose of Gabapentin that he concluded in his medical judgment was appropriate, increased it when Plaintiff complained that it was insufficient and then indicated that Plaintiff could supplement it with Ibuprofen or Tylenol.

Simply put, it is undisputed that both Dr. Dancha and Nurse Matthews saw, evaluated and treated Plaintiff for his serious medical needs. There is no evidence that either of these defendants deliberately or intentionally denied reasonable requests for medical treatment or knew of and disregarded an excessive risk to Plaintiff's health. Rather, Plaintiff merely disagrees with the nature of the treatment he received. Without more, however, his disagreement does not support an Eighth Amendment claim or demonstrate deliberate indifference to his serious medical needs. *See Young v. Quinlan*, 960 F.2d 351, 358 n.18 (3d Cir. 1992) ("an inmate's disagreement with prison personnel over the exercise of medical judgment does not state a claim for relief."); *Gause v. Diguglielmo*, 339 F. App'x 132, 135 (3d Cir. 2009) ("When a prisoner receives medical treatment and disputes the adequacy of that treatment, we are reluctant to second guess the doctor's medical judgment.")

Based on the uncontroverted record, neither Dr. Dancha nor Nurse Matthews was deliberately indifferent to Plaintiff's serious medical needs. Thus, with respect to his Eighth Amendment claims against Dr. Dancha and Nurse Matthews, their motion for summary judgment will be granted.

### B. Conspiracy Claims

Plaintiff alleges that Dr. Dancha and Nurse Matthews acted "in concert" with others to

deprive him of his rights. The Medical Defendants argue that these allegations are unsupported and Plaintiff has no factual or legal basis to maintain a claim of conspiracy. They are correct.

The Court of Appeals has held that "a § 1983 conspiracy claim only arises when there has been an actual deprivation of a right." *Perano v. Township of Tilden*, 423 F. App'x 234, 239 (3d Cir. 2011); s*ee also Marchese v. Umstead*, 110 F. Supp. 2d 361, 371 (E.D. Pa. 2000). As explained above, Plaintiff has failed to support a claim that his civil rights were violated by Dr. Dancha and Nurse Matthews. As such, his claim that they conspired to do so necessarily fails.

In addition, a plaintiff "must allege conspiracy with particularity." *Bieros v. Nicola*, 860 F. Supp. 223, 225 (E.D. Pa. 1994). That is, the allegations must be sufficient to "describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's general role in that conspiracy." *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989) (citation omitted). *See also Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178-79 (3d Cir. 2010) (holding that a § 1983 conspiracy claimant must plead specific facts addressing the time the agreement was made, the period of the conspiracy, the exact parties to the agreement, and the object of the conspiracy); *Tindell v. Beard*, 351 F. App'x 591, 594 (3d Cir. 2009) ("bare conclusory allegations are insufficient to sustain a conspiracy claim.")

As the Court has found, Plaintiff's Eighth Amendment rights were not violated. Moreover, there is no evidence in the record that could support the existence of a conspiracy or that either Dr. Dancha or Nurse Matthews engaged in any acts that were part of a conspiracy to violate his rights. Rather, they treated his medical needs.

Therefore, Defendants' motion for summary judgment with respect to Plaintiff's conspiracy claim will be granted.

C. <u>Liability of Wellpath</u>

Defendants contend that Wellpath, which is a corporation, cannot be vicariously liable under § 1983 for the actions of its employees. *See Natale*, 318 F.3d at 583 ("PHS cannot be held responsible for the acts of its employees under a theory of respondeat superior or vicarious liability.") (citing *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978)). *See also Regan v. Upper Darby Twp.*, 363 F. App'x 917, 922 (3d Cir. 2010) ("a city, municipality, or private entity that is a state actor may not be held vicariously liable under § 1983 for the actions of its agents because there is no *respondeat superior* theory of municipal liability.") Thus, even if Dr. Dancha or Nurse Matthews had violated Plaintiff's civil rights, Wellpath would not be vicariously liable for their conduct. Plaintiff does not make any specific allegations against Wellpath, but merely asserts that it employed Dr. Dancha and Nurse Matthews. Thus, he fails to allege any personal involvement by Wellpath with respect to his claims.

Thus, it would be necessary for Plaintiff to demonstrate that Wellpath, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original) (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)). As such, Plaintiff must specifically identify a policy, custom or practice on the part of Wellpath that allegedly violated his constitutional rights. *McTernan v. City of York, Pa.*, 564 F.3d 636, 658 (3d Cir. 2009). He failed to do so, nor is there any record evidence to support a claim that Wellpath maintained a policy, custom or practice that resulted in a violation of Plaintiff's civil rights. Therefore, as there are no genuine issues of material fact that could support a claim against Wellpath, its motion for summary judgment will also be granted.

V.  Conclusion

For all of the reasons discussed above, the Motion for Summary Judgment of the Medical Defendants will be granted.

An appropriate order will be entered.

Dated: March 29, 2022

/s/Patricia L. Dodge
PATRICIA L. DODGE
United States Magistrate Judge

cc:  David Payo
     07057068
     FCI Hazelton
     Federal Correctional Institution
     P.O. Box 5000
     Bruceton Mills, WV 26525